All right, good morning everyone. We are delighted to have all of you here to discuss some law and some facts as applied to the law with us today. We'll begin with case number one. It's a joint appeal. We've got 23-31-34, 23-22-16, 23-29-58, 23-30-35, 24-13-52, and 24-18-84. It's United States with a versus Eli Lilly and Company. We'll recognize Mr. Oakwood. Thank you and may it please the court. John O'Quinn on behalf of Eli Lilly. At issue in this appeal is whether the government can tell regulated parties to make reasonable assumptions in reporting drug prices and tell them not to share those assumptions with the government and that if they do, it will not look at them, but then turn around and either directly or through a relator seek treble damages and penalties under the False Claims Act under the theory that they got the reporting requirement wrong and were reckless for not seeking more guidance. That should not be the law and the district court's grant of summary judgment of falsity, which covered everything in trial, was legal error. Rather, under the particular regulatory framework at issue here, this case turns on the reasonableness and falsity turns on the reasonableness of Lilly's price reporting assumptions. And that really implicates two questions. One, was it reasonable for Lilly to view price increased value as part of its compensation to wholesalers? And if so, two, was it reasonable for Lilly to then exclude all of that service fee compensation when it reported prices? The answer to that question is yes, like the Third Circuit held in this same relator's first case, but which the district court did not acknowledge or address in granting summary judgment on the issue of falsity. Now, the history in the industry here is critical and it shows why Lilly reasonably viewed price increased value as part of its compensation to wholesalers. Because historically, wholesalers had always provided services to manufacturers. And the way that they made their money, and this is prior to 2005, the way that they made their money in exchange for providing those services off of manufacturers was solely through the value they obtained from stockpiling drugs and then reselling those drugs after a manufacturer announced price increases. The wholesalers benefited from the price increased value because it enhanced the value of their existing inventory, allowing them, the wholesalers, to profit off the spread. What changed in 2005 is that wholesalers insisted on a service fee model so that they were insured an overall predictable amount of value. And manufacturers and retailers and patients benefited from that, too, because it meant that inventory was less lumpy. It was more predictable in how it was purchased and it wasn't held back waiting for a price increase. The only thing that changed, the only thing that changed in 2005 is that Lilly began guaranteeing wholesalers a set amount of value, fair market value for their services. And if the wholesalers did not get that value from Lilly's announced price increases, which is the way they had always gotten the value up until that point, if they didn't get the guaranteed amount from the price increases, Lilly would make up the difference by topping them off with cash. So to be clear, under the 2005 contracts, the wholesalers never paid a dime to Lilly for price increased value. Wholesalers kept the value of price increases just as they had before and money flowed solely in one direction to the wholesalers as Lilly made up the difference to its guaranteed amount. Yet, the district court's basis for granting summary judgment on falsity was its view that the price increased value was not a form of compensation to the wholesalers at all and therefore could not be reasonably considered part of the fee for bona fide services. And in its words, its short appendix page 34, the price increased value was never for a service. But again, the history shows that is exactly how wholesalers made their money. And the only thing that changed is that Lilly began providing additional cash to the wholesalers to reach the guaranteed amount. And to be clear, this was a neutral change before and after the implementation of service fees by wholesalers. It wasn't a situation where Lilly was previously raising prices and then recognizing that there was a price increase to Lilly and reporting that in AMP and then it suddenly changed and stopped doing that. Okay. On this question of falsity, are you skipping to the part where you can make, where Eli Lilly can make reasonable assumptions? Isn't the rule that you seek guidance first in three documents, you know, the rebate agreement and then the Social Security Act and I forget the other document. You seek guidance there first. And if you find no guidance, at that point, the manufacturer can make reasonable assumptions. So that's my first question. Are you kind of skipping ahead in the process? And then if so, can you explain now that you're before us and we don't just have your words on the page, why, what Eli Lilly was able to realize from all this is not price actually realized as defined in the rebate agreement? So we're going back to 1991 now. And so why isn't that just a clear enough answer here? Why do we need to skip ahead in the process to be making reasonable assumptions? Yes. I appreciate the question, Judge Jackson-Akumi. If you look at, I agree with you that the Act, the regulations and the terms of this agreement, the manufacturer may make reasonable assumptions. Now, first point, I think the Third Circuit also had essentially had this issue in front of it in the Allergan case in which it concluded that the statute did not answer the question clearly. And it looked at the rebate agreement itself. The rebate agreement was in front of them in that case. And the Third Circuit, you know, specifically said that the, quote, guidance, which included that, failed to articulate a coherent position on AMP and specifically such in that case credits. Now, the reason for that is because to say that it is prices actually realized sort of then asks the question of what counts and what does not. And as the Supreme Court explained in Astra versus Santa Clara, the calculation of a manufacturer's average and best prices is a complicated, is a complex enterprise because there are many things that count. There are many things that do not count. And there are many assumptions that have to be made. So, for example, if you just look at the words prices actually realized, well, that would mean that, for example, prompt pay discounts should be taken out, should be discounted because they reduce the prices actually realized. Now, they are not because Congress, by statute, ultimately carved them out. Similarly, you know, you would think that payments from hospitals or PBMs or HMOs would count. But those are also, those are also carved out. And the other thing that is carved out specifically, and this was clear in the 2007 regulations and Congress itself did again in 2010, is that fees for bona fide services are also specifically carved out because otherwise the amount of cash that Lilly was paying, that amount of cash reduced the prices that Lilly actually realized. And so, for accounting purposes, Lilly did recognize that the cash that it was paying reduced the prices actually realized. But for government accounting, excuse me, for government pricing purposes, that did not count. Why? Because it's part of the bona fide service fee. And so the issue for Lilly was given that bona fide service fees are supposed to be excluded, price actually realized that language doesn't really answer the ultimate question here because it's not just a question of is it revenue then count it because there are many things that do not count. And bona fide service fees is one of them, excuse me, is one of them. And so for Lilly's perspective, what that meant is, and this is my point about this being a neutral change before and after the implementation of a service fee regime. Before there were service fees that were being charged by the wholesalers, no one suggested, no one would have thought that the price increase value had any effect whatsoever on Lilly's reporting obligations. And so Lilly treated that the same both before and after. It didn't previously use it to raise prices. It didn't previously use it to lower prices. And the same was true after the service fee was implemented. Same thing when Lilly implemented, excuse me, when the wholesalers implemented the service fee, Lilly, yes, began paying cash. It could have said, well, that really should be viewed as a discount. It did not. It treated it entirely neutral so that the implementation of service fees made no change whatsoever in how AMP was being calculated. Okay. Well, we've got to move on because we've got a lot of ground to cover. We've got to talk about materiality as well and stay in tune. Yes. I'm happy to do that. Judge Kohler, if you had a question on this before. No, I didn't see you over there. So with respect to this, again, when you look at Lilly's approach, it was consistent with other manufacturers in the industry. It's consistent with the district court's decision in Strat 1, the Third Circuit's decision, the unanimous decision of four circuit judges. And indeed, the inspector general reviewed this in 2013 and found that manufacturers that were doing just this sort of thing were generally in compliance. And so that confirms the reasonableness of Lilly's approach. Now, that also ties into the issue of materiality because this is a case where the government was on notice of not only Lilly's approach to price increase value and bona fide service fees and taking into account both the price increase value and the cash for calculating the overall fair market value. The government was aware of that with respect to the entire industry. It was aware in many ways. It was aware at least from 2008 with this relator's same complaint having been filed. And the government made a specific decision not to intervene after reviewing the claims against Eli Lilly in 2011. The government was also aware in 2011 based on the letter that Lilly sent. Once the Strat 1 case was unsealed, that was in 2011, this was the first time anyone had ever suggested that you should treat price increase value differently, that you should somehow subtract it out from your bona fide service fee, which would then call into question whether your service fee was bona fide and treat it as instead being a price increase. They sent a letter not to some dead letter box, not to a don't reply email address, but to an actual human being, the CMS Chief Medicaid Officer Larry Reed. And we know letters like this were received. You can see that at Supplemental Appendix page 216 and explained why it did what it did. And there was no one after that who said, you know, this is wrong. You need to recalculate it. Because the government has other remedies available to it. The False Claims Act is a blunt instrument. It goes to more than just simply whether or not a party is wrong. If the government believed we were wrong, our argument is that we were correct, but at the very least that we were reasonable, and that's what governs here. And the district court deciding that on summary judgment is, of course, an error of law. But with respect to, again, materiality, you have the OIG investigation in which the government, number one, had disclosed to it, you can see specifically Appendix 400, this very issue. And number two, the Inspector General in issuing its report said that it, in fact, did review the reasonable assumptions that manufacturers had made, and that's at Appendix 425. So the government has this, it reviews it, and it concludes in its 2014 report that manufacturers are generally in compliance. To then now say that this is material solely on the basis that it affects the amount of government that was paid, it was sort of a per se theory, that is what the district court relied on in denying Lilly's motion for judgment as a matter of law, I think turns materiality on its head. And in this case, it's particularly pernicious because the court, one of Lilly's court offenses with the district court instructing the jury that Lilly had engaged in falsehoods, one of Lilly's court offenses was that this was not material to the government. How did you know that? You know that because of how the government behaved, having been on notice of this for years. And that is the failure to give the instructions from Escobar that make clear that this is strong evidence of immateriality was a legal error that requires at a minimum a new trial with a proper instruction. I don't see, what exact language are you suggesting the district court could have given? And do all false claims cases require whatever language you are to suggest? Do you have, has any other circuit held that this type of extra language from Escobar is necessary in an instruction? Yeah, so Judge Jackson-Akumi, I think that that turns on what is at issue in a particular case. And if you look at the Supreme Court's decision in McDonald v. United States, cited in our opening brief, the Supreme Court held that it was error to simply recite the statute when the Supreme Court, when there was case law that explained what that meant that was relevant to the particular context. Now there will certainly be cases where materiality is not at issue or the materiality that is at issue isn't about what the government's conduct was, despite cases like Sanford Brown in which this court recognized that it showed that it was immaterial when, quote, neither administrative penalties nor termination was deemed warranted by the government. This court in Yannakopoulos made a very similar point at page 831. The Third Circuit leaned into this in the Petratos v. Genentech case, where you had essentially the same type of argument being made here, that but for falsity, that in that case, physicians would have prescribed less, and quote, the government would have paid less claims. The court rejected that as conflating the issue of materiality with causation. And in terms of the particular instruction, what we saw- What about the materiality instruction made it impossible for you to argue that to the  jury? Well, we presented, just to be clear, Judge Kohler, we presented evidence on this to the jury. And obviously what the jury is deciding is not based on closing arguments or opening statements, and we did address this in the opening statement. It was part of the evidence that was presented to the jury. So this is not like cases like Natalie or Nader where there's an argument that, well, you didn't even put on a defense about this. And the cases that address the issue of, well, what could you or could you have not said in closing argument, like U.S. v. Natalie in particular, aren't about what the complaining party could have said. They're about what did the other side, particularly if you're seeking an instruction that would preclude the other side from making a particular point, or that would color it for the jury, that if the government in that case, it was U.S. v. Natalie, in that case if the government had gone there, then that would have presented issue. The government didn't go there in that case, and so the court said that there was no prejudice. Here, this is about being able to enable our key defense, because the only instruction the jury was given was material means having a natural tendency to influence or being capable of influencing the payment or receipt of money or property. And Relator's argument was this, well, all that mattered is if you relied on the sheer amount of money that was being paid. You can see it in Appendix 568. And our point was, well, no, that what matters is did this matter to the government? Did it take steps like enforcement actions? Did it come back and say you're in breach of your contract? Did it say you need to pay us more money? Because if it had come to us as opposed to laying in wait, that's a discussion that could have been had and could have been rectified as opposed to using if we were wrong, which again is a disputed issue. I'm sorry. Go ahead, Judge. In counsel, I see you're running short on time and might want to save some for rebuttal. So one thing that I'm curious about, the price increase, who bears that cost ultimately? The price increase both before 2005 and after 2005, if there's an announced price increase, then what that does is it allows the wholesaler to raise its price and that increases the price that retailers pay for it. Now, who ultimately bears the cost is kind of a complicated digression because then you have other types of rebates and things that come. But I would say in the first instance, it would be the retailers. And that's true either way. Doesn't that go to the bona fide service definition? Well, I think the bona fide service definition is what are the services that they were providing. They were providing us services for picking, packing, shipping, distributing, et cetera. We were providing them fair market value for those services. And the way that they historically had gotten value for those services was through the announcement of a price increase that they profited off of and then that was it. And then the only thing that changed is they got that and then we topped that off with cash. I would like to try to save at least a minute for rebuttal, but imagine the following hypothetical. What if the contract just simply said your fee for services is going to be what you realize from price increases. That's it. Because if you look at 2005 contract, it says you're going to get your fee two ways. You're going to get it through the value of price increase and we will make up the difference in cash. What if it just said the first part? What would relator's position be? Because at that point, other than embodying it in a contract, nothing would have changed. Are they going to say that the price increase value should have been treated as, because the person who's realizing it is the wholesaler, is it going to say it should have affected what we reported despite our obligation not to report, not to include bona fide service fees? Are they going to say it should have been treated as a discount? Because if the answer is it makes no difference, it makes no change, the only small change that was made in 2005 was the fact that we said, yeah, you're going to get that and we're going to give you additional cash on top of that to make up the difference to get you to the guaranteed amount. Judge Ripple, if you had a question, I'm happy to take it. I'll save you time. Okay. Thank you, Your Honor. All right. Is this Mr. Miller approaching? Yes, Your Honor. I'd like to hand up to the I know before you filed the motion, you shared with appellants, but do you have comments or copies for them this morning? Yes, we just provided them, Your Honor. Okay. Thank you. You may begin. May it please the court, I am Dan Miller and I represent the relator in this case, Ronald Streck, who's here with us in the courtroom. I want to first address very briefly three comments my learned colleague made. One, it's an incorrect statement that falsity turns on reasonableness. That is flatly untrue. Reasonableness is solely relevant to Scienter, as the Supreme Court made clear in the super value decision issued last year. Second thing he said is that the Third Circuit analyzed the rebate agreement in its decision issued back in 2018. That is not true. The Third Circuit only cited the statute and never got to the price actually realized requirement. And the third point I want to save for later. Your Honor, to hear my opponent tell the court the story here, you would think that this case is really complicated, that Lilly tried its absolute best to comply with the law and that the jury's verdict is nothing but a huge injustice. But none of that is true. Lilly's arguments are based in their entirety on a false predicate. Namely, that the money Lilly pocketed from its own price increases was somehow part of the service fees Lilly paid to its wholesalers. And that the wholesalers quote, my opponent said, never paid a dime to Lilly. We can debunk that claim very clearly with the exhibit I just handed to you. And we're going to go through it line by line. But Lilly invoiced its wholesalers for the price increases. These invoices say nothing about services or service fees, despite the claim that price increase value is somehow part of the service fee. They don't say that word at all. Instead, they are literally a demand from Lilly for money, dollar for dollar, in the amount of its price increases. This changed the amount of money Lilly pocketed, meaning that Lilly realized. Triggering Lilly's legal obligations under the Medicaid rebate agreement, most cogently as applies here, is the price actually realized requirement, which is to include cumulative quote, cumulative discounts or other arrangements that subsequently adjust the price actually realized. As we will soon see, that's exactly what Lilly's invoices did. The business sequence that led to the invoices that you have in your hands is very simple. Lilly sells its drugs to wholesalers at an initial price, but by contract, if Lilly raises its prices subsequent to the initial sale, Lilly sends an invoice asking the wholesalers to pay a second additional payment. It is this second subsequent payment that Lilly failed to include in its AMP reports, despite the express price actually realized requirement. So I'd like to turn to the invoices themselves. The handout that I've given you is a typical example of those invoices. This particular invoice was issued to a wholesaler named McKesson for price increases Lilly initiated in one quarter of 2015. As you can see from the first page, Lilly demanded payment of more than $23 million for its so-called price recapture. But the next page shows you what you really need to see, which is that price increased value or price recapture has nothing to do with services. Instead, price increased value is a pure cash grab for drugs. First, respectfully, if your honors could look at the top left of the page, and the larger page I gave you is just a blow-up of the second page so you can see it a little bit better. If you look at the top left-hand corner, Lilly tells you what the document is. It's a quarterly demand-to-be-paid price increased valuation. Then if your honors can look to the top right of the page, you can see that the total dollar amount that Lilly is demanding is $23 million. And below that is where the sausage is made. You can see how that $23 million figure was derived. In sum, it is the sum of each individual drug on which Lilly raised prices multiplied by the number of units of each drug in that wholesaler's inventory at the time the price increases occurred. The document itself establishes these facts. Take, for example, the drug Cialis. You can see the line entries for Cialis by looking at the column titled Product Group. That's the second column to the right of the Your honors will note that there are five lines listing Cialis. That's because there are five different formulations of that drug which underwent price increases during this quarter. As you can see for each line, there's an old price and a new price. The key to this case is understanding the column titled New Price. As you will see, the new price for the first version of Cialis listed on the spreadsheet is $1,251. $1,251 is itself the sum of the old price and the price increase value. Again, the document itself shows you this is true. The old price, meaning the initial price, is $1,138. Then, if you look at the column on the far left of the page, top left, titled Percent Increase, you see that Lilly raised the price of Cialis by 9.9%. This led the old price of $1,138 to increase by $113. And when you add that $113 to the original initial price of $1,138, you get the new price of $1,251. The total dollar value of Lilly's fraud as it relates to this formulation of Cialis is then derived by multiplication. As shown on the invoice, you simply multiply the $113 price increase value by the number of units of that version of Cialis that was in the wholesaler's inventory, which leads for this particular formulation to a price recapture of $384,412, which is reflected in the column on the far right page, far right column of the page, titled Price Recapture. And that's it. There's the false predicate. While it is true, as my opponent just stated, that Lilly pays wholesalers for services such as warehousing, inventory management, and drug delivery, price increase value has nothing to do with these services. Instead, it is exactly what its name states, value from price increases. And because the value from these price increases subsequently adjusted, the amount of money Lilly actually realized, the price actually realized, Lilly was required to include that money in AMP reports to the government, and its failure to do so rendered its AMPs false. Judge Leinweber saw that, saw this for what it was, what he correctly found, that there was no dispute of material fact regarding what happened. Specifically, he was correct as a matter of law when he found that, quote, I am unable upon careful review to find any reasonable interpretation of the statute that would support Lilly's partial exclusion of the price of its drugs from its average manufacturer's price. Moving on from Judge Leinweber's ruling on falsity, Lilly's remaining arguments relate to materiality and scienter. Go ahead, Your Honor. Yes, because we don't have much time, can we just skip to materiality? Yes, ma'am. Even assuming we agree with you on what happened in 2005 through 2011 through 2013, we get to 2016. And there's a meeting and, you know, the Eli Lilly witness admitted the government had not approved what was happening at that meeting. And so there we have, by then it seems we have pretty significant evidence that the government knew what was happening with PIV by 2016. We don't dispute that, Your Honor. Right. So on this materiality prong, why wasn't the verdict for relator wrong when you get to this point in the timeline? First, let me just say that everything that Lilly argued in front of this court in its brief went to the jury and the jury found for us. So all of the arguments were already presented. I guess I'm trying to understand what that reasonable jury was thinking when it got that piece of information about what the government knew as of 2016. Because at that point, you now have government knowledge and government inaction. And, you know, Escobar doesn't require approval. Judge, I would respectfully disagree that there was government inaction. The investigation by the Department of Justice acting on behalf of CMS was, had been on this lawsuit. Did the jury know that that investigation had begun at that time? The jury knew that the lawsuit had been filed. Uh, I, I don't believe we got into the Department of Justice investigation. So I, I, I couldn't tell from the record that the jury knew an investigation had begun at that time. Well judge it, but it had. And the point is that our opponent is arguing that CMS and the government acquiesced. They did not. The government filed briefs and is here today on behalf of CMS in 2018 in the trial court supporting relators case. The government's been behind this all the time. CMS heard in 2016 what Lilly was doing, but this lawsuit is, is the vehicle through which CMS has chosen to enforce its remedy. And in fact, that's why they're supporting us here is this is the vehicle, not exclusion of Lilly from the Medicaid program as my learned colleague suggested. It is this action that shows the materiality. Okay. Thank you. Thank you Mr. Miller. All right. We welcome Mr. Dos Santos. Thank you, Your Honors. Joshua Santos on behalf of the United States. So, so we've heard just now how the scheme worked here or how the arrangement works. I'll just briefly summarize and then just get right into the law. So what was happening was Lilly was selling to wholesalers and after the initial sale, it would raise its prices and then require the wholesalers to pay or credit to Lilly the amount of the price increase. At all relevant times, the rebate agreement since 1991 said that any subsequent arrangement that alters the price actually realized needed to be reported to Medicaid. The district court then held that that was false. The price reports were therefore false because they didn't include those price increases and then the jury found that the price reports were material to the payment of money as the statutory standard and at least reckless. So most of the arguments so far have been or about falsity in the briefs have been about uncertainty. So I think Lilly's argument is generally that it was not obvious that these price increases needed to be reported for various reasons. It really was uncertainty and the government's really fundamental point here is that kind of inquiry about uncertainty or confusion, that's knowledge inquiry that goes, in this case, went to the jury. It is not the falsity inquiry. The Supreme Court really already decided this issue last year in super value. So in super value, as in this case, it was a price reporting case. So it was about reporting of what was called usual and customary prices. And in that case, the defendants like here said, well, our price reports were based on our view of the law, which we think was unclear. And so therefore it can't possibly be false sort of as a matter of law. And the Supreme Court said, no, what you reported were these numbers, the prices, you weren't saying, here's our view of the law, you were reporting numbers. And if those prices were calculated inaccurately or inconsistently with the, the requirements for calculating such prices, then they were false. And in that case, it was assumed that they had been calculated inconsistently with the applicable requirements. So the Supreme Court already made that clear. And then in the same case, the Supreme Court's knowledge holding, which really was the primary focus there, the Supreme Court said, you can act with knowledge of a false statement, even if an objectively reasonable person might have been confused about whether that was false or not. If that is true, if you can act with knowledge of a falsehood, even when there is some kind of objective ambiguity, it must be true that it can be false. So I think Super Value really resolves this across the circuits. There's lots of precedent explaining that a legal compliance issue like, like the issue here is an either or question. It is binary. It's either compliant or it's not compliant. How does all this relate to the Sienta requirement? So Sienta is the other element, and I'm happy to discuss that here. It seems that one of the things that, it's so far, to me, the 500 pound griller in the room here is nobody's really made that, talked about that relationship between the two, falsity and Sienta. Right. So, so they are separate elements under the false claims. I think in Super Value, the Supreme Court's analysis really shows that. Escobar, as well, sort of separates it out. I think it's very clear they're separate elements. And the confusion and uncertainty arguments that Lily made before the jury and then renews here today are not sort of matter of law arguments for falsity. They go to, to knowledge. They're all, we all agree, I think that all of that is relevant to knowledge. I think the important thing to, to emphasize here is that if you import that kind of analysis into falsity as a matter of law question, take it away from, from the jury, it really does transform the False Claims Act. It has significant consequences because then, even if someone was an intentional fraudster, they thought they were committing fraud, they can just rely on an attorney to later find an, an arguable ambiguity and say, well, it could just never be false because there was an ambiguity about it. And that would really make it difficult for the government to police fraud in myriad of Medicaid programs like Medicaid, many of which are designed to serve vulnerable people. And the, the, um, the, the persons who are contracting with the government and for it have relationships with the government, the longstanding rule under Heckler in many cases is that they have to turn square corners with the government. This kind of rule would just turn that on its head. Um, and it would really incentivize pushing the boundaries on reliance, hopefully that an attorney can later find an ambiguity and turning to, to the knowledge question that I know your, your honor had a question about. I think it's also important to, to recognize the False Claims Act has the three elements of knowledge. It has the actual knowledge, deliberate ignorance, and reckless disregard. Uh, this court's precedent has already made clear in cases like Heath and Berkowitz and Kingvassel and Thurman and many others that includes objective reckless disregard. That is when you act in disregard of an unjustifiable and obvious risk that should have been known to you. Uh, that was largely the, the theory. I think that was before the jury. It is a theory that is recognized across the circuits. There was a suggestion, I think in the opening brief, although not so much emphasized in the reply brief, uh, that the super value decision changed that it did not. A footnote in the decision clearly said, we're not addressing objective reckless, recklessness here. They were only in the knowledge portion of the opinion. The Supreme Court was only addressing the argument that when something is, when a defendant says that they relied on an objectively reasonable view of the law, you can never have a subjective knowledge. That is where you, the person believed they were committing fraud. It wouldn't be relevant. Supreme Court said, no, of course it's relevant. It wasn't addressing the objective recklessness. So it's clearly a valid theory. Um, just want to emphasize that off the bat. And then of course when you, when you review a jury verdict, as we have in this case, obviously there's lots of deference for a jury verdict. We think there was clearly enough evidence to support the jury's finding of recklessness. At least here. Uh, we have, uh, to start with the fact that at the, the focus of the knowledge question at the trial was Lily's argument that it renews here that it really was not, uh, it was not obvious that it needed to report the price increases, price increased value payments, excuse me, as price increases to Medicaid. But then it came out that its employees had called them price increases, that they called them clawbacks or a price recapture. And then, uh, Lily's explanation at the trial, uh, offered by its pricing employee was that, uh, among other things, they thought they only needed to report price decreases that would lower the rebates, but not report the price increases. The jury was entitled to disbelieve, you know, either the reasonableness of that kind of explanation or the sincerity of it. And then there was lots, there was, uh, the fact that there wasn't much evidence at all of any analysis or advice sought from others, uh, with respect to this question, which went to, I ran into like $60 million of, uh, underpaid rebates. So I think that kind of, uh, evidence was clearly sufficient for the jury here. I want to pause for any questions. Okay. So, um, turning to materiality, I just want to emphasize the government's fundamental point here is this is an easy case for materiality. Uh, in Escobar, the Supreme Court said it's relevant if it was major or substantial. Uh, it's relevant if it was an express condition, it's relevant if it went to the essence of the bargain. And all of those factors are clearly present here. We're talking about $60 million that went to the rebates, which is the entire point of the rebate agreement, uh, program. Maybe, maybe then you ought to address damages since you invited questions and, um, you know, you're, you're alluding to it because that's an issue for us to consider too. Are you referring to the cross appeal about damages? Yeah. Is that not you and your colleague? Is that your colleague? It's, it's my colleague. The government has not taken a position on that in this case. Okay. All right. Continue then. Okay. So, so on, on materiality, it's an easy case for those reasons. It was major and substantial. It went to the essence of what the rebate program is about, just rebates. Um, and it was an express condition to report practice prices actually realized. Lily's argument is, well, Escobar changed that. It's now all about evidence of, of government, uh, knowledge or acquiescence. And, uh, I just want to make clear at the outset, Escobar said that was a relevant factor. It could be strong evidence, but it didn't say that was the deciding factor. It listed all these other factors that all clearly weigh in favor of materiality here when we're talking about $60 million automatic reduction in the rebates that Medicaid was receiving. Escobar's discussion, if you read through it, I mean, it says, uh, the statute defines materiality as, uh, the capacity to influence the payment of money. It said that's well-grounded in the case law of the Supreme Court. It's well-grounded in the common law. And then it just applied that fundamental standard to various factors. Uh, I think it's, it's clear that the evidence that Lily suggests was determinative here is not under the law. And even the, under its own terms, if you look at the particular pieces of evidence, they're not, uh, they're clearly not of the kind that would require the jury to find that the government actually knew or much less acquiesced in the arrangement here. Uh, in particular, I'll just briefly mention the 2016, uh, um, meeting that, that Your Honor referred to. So the, Lily stopped doing this, this, uh, failure to report right after that. Lily started reporting the price increase value payments. So, so that changed things. Thank you very much. Thank you, Mr. DeSantos. All right, Mr. O'Quinn, uh, we'll give you three minutes. Thank you, Your Honor. Um, I'd like to make three points. First, with respect, um, Judge Jackson, uh, accuse me to your question about, uh, the, the, the 2016 meeting you can see at appendix 233, the details of that meeting, exactly what was disclosed in, in that meeting and Lily's, uh, subsequent change that, uh, that my colleague just referred to, uh, then happened later in, in, in 2017. But the key point is for the jury to appreciate the significance of the government's inaction in the face of that meeting and indeed to appreciate the significance of the government's inaction going back to 2008 when this relator made the same claims against Lily, the government specifically declined to intervene in 2011, uh, in that case. And Lily also made these exact same points to OIG, uh, the Office of the Inspector General in 2013 for the jury to appreciate the significance of the government's inaction, it needed to be instructed because otherwise it allowed the argument that you heard, heard here today was just that money is per se material, period, full stop. And the, instead, the jury needed to be instructed so they could understand just like, uh, this court in, in, in, uh, Yannikopoulos, uh, just like, uh, the Third Circuit, uh, addressed, uh, in, in, um, excuse me, just like this court in Sanford Brown that the fact that the government never, neither sought penalties nor termination was, uh, significant. That's the first point. Second point, Judge Ripple, on, on your question, uncertainty, ambiguity matters both to falsity and to scienter. That is what the District Court recently held in remand in the Sheldon case, which we provided in our 28J letter, is exactly what the Third Circuit held in the United States versus HERA, which is discussed extensively in the Chambers amicus brief. The Third Circuit there explained, quote, ambiguity is relevant to falsity in its own right, end quote. And it cited cases from the First, Fourth, Eighth, Tenth, and Eleventh Circuits supporting that, that proposition. And indeed, of course it is because as, as Justice Scalia, I think famously put it in the title to fair notice in dealing with his government, end quote. And that is what is, is lacking here precisely because of, of the ambiguity. If it was as plain as day as Relator is saying that it was, then you can't explain the unanimous views of four federal judges who had the exact same rebate language in front of them. No, they didn't discuss it in their opinion. They referred more generally to, to the guidance. But there's, as we showed you in our brief, they had that language and they nonetheless found that this was ambiguous and identical conduct was at least, at least reasonable. And then the, the third point and, and, and then, you know, super value doesn't change this. It was addressing scienter, not falsity. Again, a point that the Sheldon Court made on remand very, very recently. And then the third point that I want to make is with respect to the, the, the page that was handed up and this document from 2015, what I said was that under the 2005 contracts, there was never a dime of price increase value that flowed from, from wholesalers to Lilly. And that is true, that there was not under the 2005 contracts. Now yes, when the 2000, excuse me, when the, when, when the contract was changed in 2009, then there was simply, all that changed was the sequence of events. That is, it operated like a tax return. Instead of wholesalers getting the benefit of price increased value and Lilly topping off, it operated like a tax return where Lilly fronted the value. And if it turned out then that there was a credit because they did subsequently realize benefit from price increased value, then they refunded that amount to Lilly. Just like when you pay in estimated taxes, if there's a credit that applies, the government pays, the government refunds that to you. That's not a payment for something. I thank the court for its time. I'm happy to answer any additional questions should the panel have any, but I am mindful that I've used my time. Okay. We thank the parties and we will take case number one under advisement. Thank you, Judge Jack McKinney.